**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
HONORABLE ROBERT B. KUGLER**

| | |
|---|---|
| UNITED STATES OF AMERICA FOR THE USE AND BENEFIT OF E&H STEEL CORPORATION, | : <br> : <br> : <br> : |
| Plaintiff(s), | : |
| v. | : Civil No. 04-2519(RBK) |
| C. PYRAMID ENTERPRISES, INC., FIDELITY & DEPOSIT INSURANCE COMPANY OF MARYLAND AND ZURICH AMERICAN INSURANCE COMPANY | : **OPINION & FINDINGS** <br> : <br> : <br> : |
| Defendant(s) | : |

## INTRODUCTION

How much does a steel fabricator have to do to qualify as a "subcontractor" under the Miller Act, 40 U.S.C. §3133(b)? On that seemingly simple question rides plaintiff's claims for $565,125.40. The Act does not define the terms. The parties vigorously contest the issue.

Here, a general contractor (the defendant) hired a steel fabricator to provide all the steel on a large government building. That fabricator, in turn, hired the plaintiff to do some of the steel work. As might be suspected, the defendant paid the original fabricator for the work, but that party failed to pay the plaintiff in full before declaring bankruptcy. If the original fabricator is indeed a "subcontractor," the plaintiff can recover under the defendant's bond. If not, then the plaintiff gets nothing. As will be demonstrated, the defendants prevail in this difficult case.

After the Court denied cross-motions for summary judgment, the parties proceeded to a non-jury trial on June 7, June 8, June 9, and June 12, 2006. Post trial briefing concluded on July

28, 2006.  The following represents the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.  Jurisdiction is based on the Miller Act.

## FINDINGS OF FACT

**A.  Background**

1.  On September 12, 2002, C. Pyramid Enterprises, Inc. ("CPE") was awarded a contract by the United States Army Corps of Engineers to design and build a C-17 Maintenance Hangar and Aircraft Maintenance Shops at McGuire Air Force Base in New Jersey (hereinafter "the Project").  The original contract price was $24,119.450.00.  Stipulated Fact No. 1.

2.  As required by the Miller Act, 40 U.S.C. §3131(b)(2), CPE issued a payment bond in the penal sum of $24,119,450.00, with defendants, F & D and Zurich, as sureties, whereby CPE and its sureties, jointly, and severally, obligated themselves to pay "all persons having a direct relationship with [CPE] or a subcontractor of [CPE] for furnishing labor, material or both in the prosecution of the work provided for in the contract . . . ."  Stipulated Fact No. 2.

3.  CPE contracted with LZA & Associates ("LZA") to assist CPE with the design of the Project, including the design of the structural steel frame.  Stipulated Fact No. 3.

4.  The Project houses and provides service to the Boeing C-17 Globemaster and McDonald Douglas/Boeing KC-10A aircraft and consists of an enclosed 22,000 square meter, "column-free" aircraft service bay (203' wide x 213' long x 77' high) with maintenance shops and offices, supported by a structural steel superstructure, consisting of long span jumbo roof trusses (203 feet long) designed by LZA Associates/Thornton-Tomasetti Group ("LZA"), as CPE's structural engineer, and fabricated for CPE by Havens and E&H.  Stipulated Fact No. 4.

5.  On June 5, 2003, CPE sent its standard form "purchase order" to Havens Design Build ("Havens") which stated that Havens would provide the structural steel for the Project ("the Purchase Order").  Stipulated Fact No. 5.

6. The Purchase Order, as drafted by CPE (printed and typed portions) and as revised by Havens (handwritten portions and the attached July 14, 2003 letter), obligated Havens, in pertinent part, to provide the described services and materials for a total contract price of $2,230,000.00.  Stipulated Fact No. 6.

7. As required by the Purchase Order, the structural steel shop drawings were prepared by Havens' detailers.  Stipulated Fact No. 7.

8. Shop drawings graphically depict for the structural steel fabricator each member of steel, (including the member's exact size, shape and dimensions) for the fabricator's use in fabricating each piece of steel to 1/16th of one inch.  Stipulated Fact No. 8.

9. Havens' detailers also prepared erection drawings.  Stipulated Fact No. 9.

10. The shop drawings were submitted by Havens to CPE and LZA for submission to the Army Corps of Engineers for review and approval prior to fabrication to ensure that the structural steel complied with the contract specifications.  Stipulated Fact No. 10.

11. Havens' detailers used 3-D modeling on this Project, however, this was not required by the Purchase Order.  Stipulated Fact No. 11.

12. In addition to the preparation of shop drawings, the Purchase Order also obligated Havens to prepare the steel-to-steel connections and calculations ("connection design").  Stipulated Fact No. 12.

13. As part of the connection design, Havens suggested and CPE and LZA accepted bolted (rather than welded) connections of steel members.  Stipulated Fact No. 13.

14. After Havens received the approved shop drawings, the steel could be fabricated.  Stipulated Fact No. 14.

15. On November 21, 2003, Havens entered into an agreement with E&H for E&H to supply all labor, paint, material and trucking required to fabricate, paint, and deliver F.O.B. to the jobsite all girts, purlins and columns in sequence 14, 15, and 18, based upon steel materials and

shop drawings furnished by Havens Design-Build.  Ex. P.15.  The E&H purchase order refers to E&H as "Subcontractor."  E&H fabricated and delivered all steel in sequence Nos. 14, 15 and 18.

16.  E&H delivered 50 trailers of fabricated steel to the Project, between November 13, 2003 and April 16, 2004.  Stipulated Fact No. 15.

17.  Havens filed for bankruptcy and failed to pay E&H the amount of $565,125.40, which was owed to E&H for structural steel fabricated and delivered to the Project.  As a result, E&H has pursued a claim against defendants under the Miller Act, 40 U.S.C. §3133(b)(2), for payment of $565,125.40, plus interest and all costs.  Stipulated Facts No. 16.

18.  CPE asserted setoffs against Havens and filed a claim against Havens in the bankruptcy for setoffs totaling $1,099,621.28.  Stipulated Fact No. 17.

**B.  Details of the CPE-Havens Agreement and Relationship**

19.  CPE and Havens entered into what the document refers to as a "Purchase Order." Ex.D-4, Havens agreed to provide the custom fabricated steel in accordance with the specifications set forth in the CPE-Army Corps of Engineers contract.

20.  Paragraph 13 of the "Purchase Order" provides that:

> "The vendor shall not assign this order, nor any monies due or to become due hereunder without the Vendee's prior written consent; and any attempted assignment without the Vendee's consent shall be null and void."

Ex. D-4.  Because of this provision, and because CPE believed Havens was not a subcontractor but merely a material supplier, that would not, under any circumstances, subject any portion of its responsibilities to another firm without written authorization, CPE did not request a payment bond from Havens.  4T:97-17 to 98-12, 1T:65-3 to 7.  Moreover, CPE did not have Havens complete a Form 1413, which is a requirement for all subcontractors on a federal construction project.  3T:128-20 to 25; 4T:108-1; 3T:132-1 to 3.

21.  The Purchase Order also required that Havens provide "design assist engineering and structural steel scheduling support" and "connections and calculations."  Delivery was to

begin "no later than August 25, 2003, with the balance of Hangar to follow in a time frame that will coincide with the attached steel schedule."  Moreover "Havens will participate in Design changes and will work Directly with LZA" and "Havens can achieve at least $50,000, or more in savings to CPE on this Project."  Ex. D-4.

22.  The work done by Havens amounted to only 7.8% of the total contract price. 4T:104-10.  CPE did not issue any other contracts in excess of $2 million. 1T:68-6.  CPE did all the other work itself, including electrical, mechanical, utilities, and concrete work.  1T:68-10 to 71-3.

23.  Havens and CPE did not have any prior business relationship. 4T:103-22.

24.  Havens did not design the C-17 hangar.  4T:103-13.

25.  Havens did not erect any of the steel and did not supervise the erection of the steel on site.  4T:103-14 to 20.

26.  Havens did not have a representative on-site, 4T:103-20, and performed no on-site labor of any kind.

27.   Havens' obligation to CPE ended with delivery of the steel.  4T:104-14.

28.  The only engineering Havens was responsible for was the detailing of the connections.  4T:105-4.

29.  No one from CPE or the government ever visited the Havens' fabrication shop.  4T:105-5 to 10.

30.  CPE never held any retainage from Havens, 4T:105-15, and the government did not authorize it.  3T:14-1.

31.  Havens' representatives Steve Hofmeister and Rodney Baxter visited the project site on a few occasions to present their bill, take a look at the job, and take photographs.  4T:122-1 to 7.

32.  Havens was paid "in a combination of material deliveries to the site and material stored off-site."  4T:124-4 to 9.  CPE did not make progress payments to Havens.  4T:124-17.

33. Havens did not maintain any sizeable inventory of steel needed for this Project. 2T:54-15 to 55-3. The only inventory on hand was for connections, 2T:55-12, which typically amounts to about 10% of the material required for the project. 2T:56-2.

34. The shop drawings prepared by or on behalf of Havens were unique to this job. 1T:189-24. However, these kinds of drawings are customarily done by all steel fabricators. 1T:190-19; 2T:78-10 to 80-14.

35. Action Steel Detailing, working for Havens, prepared a 3-D computer model, which it thought would assist CPE in the erection of the steel. 1T:193-22 to 194-2. However, it was not necessary, 1T:194-17 and was not required by the purchase order, 1T:93-10, and was never used by CPE. 4T:112-21.

36. Havens offered design-assist engineering to CPE and LZA. However, this amounted to little more than material substitution. 1T:45-14 to 24. None resulted in any cost savings to CPE. 1T:42-22 to 43-8. Testimony to the contrary by James Kelly was not based on personal, first hand knowledge. 2T:86-3 to 87-11.

37. None of the change orders submitted by Havens to CPE or the Army were ever approved. 1T:108-12 to 109-23.

**C. CPE's "Relationship" with E&H**

38. Chris Johnson, a CPE employee, signed E&H's first bill of lading on November 17, 2003. Ex. P.20. From that date until March, 2004, E&H delivered more that 40 trailers of fabricated steel to CPE. Ex. P.20. E&H also made numerous phone calls to the project site during this period. Ex. P.30.

39. There is no credible evidence CPE ever submitted any E&H bill of lading to the Army Corps of Engineers.

40. Neither E&H nor Havens ever formally notified CPE in writing of E&H's role. 3T:70-16 to 72-9.

41. No officer or executive of CPE learned Havens was using E&H until after

Havens' bankruptcy.  4T:98-13 to 15; 1T:64-9 to 14; 4T:101-17 to 22.

     42.  As to the bills of lading, CPE typically had 40 employees on the job site on an average day.  4T:100-13.  The people who signed the bills of lading on behalf of CPE were low level employees, below the level of foreman.  4T:101-8 to 12.  E&H never billed CPE.  4T:101-16.

     **D.  "Complex"**

     The parties, particularly plaintiff, spent an inordinate amount of time attempting to show this was a "complex" project.  The opinion of a witness, expert or otherwise, on this issue is of little assistance.  Plaintiff's witnesses testified this project was "complex."  See e.g., 2T:113-6 to 24.  Defendant's witnesses, not surprisingly, disagreed strongly.  See e.g., 4T:119-6 to 121-16.  Though resolution of this issue may not be necessary, it seems that although the steel fabrication was an important component, the steel fabrication job was not particularly difficult.

## ANALYSIS AND CONCLUSIONS

     The Miller Act provides that prime contractors who receive government contracts for federal projects must post a payment bond to protect those who supply labor or materials as part of the work provided for under the federal contract.  See 40 U.S.C. §3131(b).  In a case of a private construction project, a supplier of labor or materials can protect itself from non-payment through a mechanic's lien against the project property under state law.  However, parties cannot obtain a lien against government property.  Therefore, the Miller Act was intended to provide an alternative remedy to protect the security interests of suppliers on federal projects.  See J.W. Bateson Co., Inc. v. United States ex rel. Board of Trustees of the National Automatic Sprinkler Indus. Pension Fund, et al, 434 U.S. 586, 589 (1978) (citing F.D. Rich Co. v. United States ex rel. Indus. Lumber Co., 417 U.S. 116,122 (1974)).  With that purpose in mind, courts have interpreted the Miller Act to be "highly remedial" in nature.  F.D. Rich Co., 417 U.S. at 124

(citing MacEvoy Co., et al v. United States, for Use and Benefit of Calvin Tomkins Co., 322 U.S. 102, 107 (1944)).

Section 3133(b)(1) provides a general description of the rights afforded by the Miller Act. It states:

> **(1) In general.--**Every person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 of this title and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought and may prosecute the action to final execution and judgment for the amount due.

40 U.S.C. §3133(b)(1). In turn, §3133(b)(2) limits somewhat the general rights announced in §3133(b)(1). The section provides:

> **(2) Person having direct contractual relationship with a subcontractor.--**A person having a direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor furnishing the payment bond may bring a civil action on the payment bond on giving written notice to the contractor within 90 days from the date on which the person did or performed the last of the labor or furnished or supplied the last of the material for which the claim is made. The action must state with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed.

40 U.S.C. §3133(b)(2).

Although the Miller Act does not define the term "subcontractor," the U.S. Supreme Court addressed the issue in MacEvoy, v. United States for Use and Benefit of Calvin Tomkins Co., 322 U.S. 102 (1944). In MacEvoy, the Court reiterated that the following individuals could take from the prime contractor's payment bond under the Miller Act: (1) materialmen, laborers, and subcontractors who dealt directly with the prime contractor; and (2) materialmen, laborers, and subcontractors without an express or implied contract with the prime contractor, but with a direct contract with a subcontractor. Id. at 107-08. However, the problem with cases falling in the second category is that the Miller Act failed to define the term "subcontractor." In addressing

the issue, the Court decided that the relevant definition should be the specific, technical meaning of the term as used in the building trades. Id. at 108-09. Thus, the Court defined "subcontractor" for purposes of the Miller Acts as "one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen." Id. at 109.

In reaching this conclusion on the meaning of "subcontractor," the Court relied upon the legislative history and intent behind the Miller Act, as well as certain practical applications. In particular, the Court reasoned that Congress could not have intended to impose liability on the payment bond in situations where it is nearly impossible for the prime contractor to foresee such liability and protect itself. Id. at 110. In other words, it is easy for the prime contractor to require a subcontractor (as defined by the Court) to post a bond as security, but it is nearly impossible for the prime contractor to protect itself in the same manner from defaults by more remote materialmen, suppliers, retailers, etc. See id. at 110-111. Given these practical concerns, the Court adopted a narrow, technical definition of the term "subcontractor."

After MacEvoy, courts interpreting the Miller Act have added slightly to the standard used to determine whether an entity is a subcontractor or not. To determine "subcontractor" status in borderline cases, the court must look beyond the contract terms and examine the "substantiality and importance of the relationship between the middle party and the prime contractor." See F.D. Rich Co., 417 U.S. at 123-24 (citing Aetna Cas. & Surety Co. v. United States for the Use and Benefit of Gibson Steel Co., Inc., 382 F.2d 615 (5th Cir. 1967)). That said, the Supreme Court has found that "a contract with a prime contractor is a prerequisite to being a subcontractor." J.W. Bateson Co., 434 U.S. at 590. In other words, any party who has merely dealt with a sub-subcontractor cannot recover from the prime contractor's payment bond.

In light of the fact-intensive inquiry necessary to determine subcontractor status under the Miller Act, it is recognized that the relevant case law presents a number of factors to consider, but does not provide a general rule of law which is dispositive of any particular case. United

9

States for the Use and Benefit of Parker-Hannifin Corp. v. Lane Constr. Corp., et al, 477 F. Supp. 400, 410-11(M.D. Pa. 1979).  Some of the factors to consider include:  (1) the nature of the material or service supplied by the alleged subcontractor to the prime contractor, see F.D. Rich, 417 U.S. 116; United States for the Use and Benefit of Consol. Pipe & Supply Co. v. Morrison-Knudsen Co., Inc., 687 F.2d 129 (6th Cir. 1982); Miller Equip. Co. v. Colonial Steel & Iron Co., 383 F.2d 669 (4th Cir. 1967); United States for the Use of Wellman Engineering Co. v. MSI Corp., 350 F.2d 285 (2d Cir. 1965); Parker-Hannifin, 477 F. Supp. 400; United States for the Use of Potomac Rigging Co. v. Wright Contracting Co., 194 F. Supp. 444 (D. Md. 1961); (2) the financial magnitude of the goods or services provided in relation to the total federal contract, see Morrison-Knudsen, 687 F.2d 129; Miller, 383 F.2d 669; United States for the Use and Benefit of Tom Clark d/b/a Building Specialties Co. v. Lloyd T. Moon, Inc., 698 F. Supp. 665 (S.D. Miss. 1988); Parker Hannifin, 477 F. Supp. 400; (3) the payment terms and exchange of information between the prime contractor and alleged subcontractor, see MSI Corp., 350 F.2d 285; Moon, 698 F. Supp. 665; Wright, 194 F. Supp. 444; and (4) the overall relationship between the prime contractor and the alleged subcontractor, see F.D. Rich, 417 U.S. 116; Morrison-Knudsen, 687 F.2d 129.  Each of these factors, in turn, breaks down into several additional considerations discussed briefly below.

First, there are several relevant considerations regarding the nature of the goods and services provided by the alleged subcontractor.  Courts analyze (1) whether the goods produced came from inventory or whether they had to be custom-manufactured, (2) whether they were complex in nature, (3) whether they constituted a significant and integral portion of the overall project, (4) whether the items provided were generally available on the market, (5) whether the subcontractor performed work on-site, (6) whether the alleged subcontractor had design or installation responsibility for the items or services it provided, and (7) whether the alleged subcontractor had ultimate responsibility for a portion of the work under the government contract.  See Morrison-Knudsen, 687 F.2d 129; Miller, 383 F.2d 669; Gibson Steel, 382 F.2d

615; MSI Corp., 350 F.2d 285; Moon, 698 F. Supp. 665; Parker-Hannifin, 477 F. Supp. 400. Overall, the more complex, custom-made, and integral the entity's product or service is to the overall project, the more willing courts are to designate that entity as a subcontractor. Likewise, the more on-site responsibility the entity has, the more likely it is to be a subcontractor rather than a material supplier. See Gibson Steel, 382 F.2d at 618; Moon, 689 F. Supp. 665 at 667. But see MCI Corp., 350 F.2d at 286 (noting that failure to perform on-site work is not necessarily fatal to subcontractor status).

Second, the payment terms and exchange of information between the parties may be relevant to determining subcontractor status. Courts consider whether the alleged subcontractor was paid in progress payments based on the percentage of work completed. See Gibson Steel, 382 F.2d at 618; MSI Corp., 350 F.2d at 287; Moon, 698 F. Supp. at 667; Wright, 194 F. Supp. at 444. If so, courts will weigh that factor in favor of subcontractor status. Courts also consider whether the prime contractor "backcharged" the entity for unsatisfactory work, or required the entity to post a security bond, provide payroll and insurance data, etc. See Gibson Steel, 382 F.2d at 618; Moon, 698 F. Supp. at 667; Wright, 194 F. Supp. at 447. But see Miller, 383 F.2d at 674 (noting that the reason the middle party did not post a bond was because the prime contractor failed to ask for one). Entities that provide this kind of material are more likely to be subcontractors.

Finally, courts also examine the nature of the relationship between the alleged subcontractor and the prime contractor. See F.D. Rich, 417 U.S. at 123-24. Where the management and financial structures of the two companies are closely interrelated and they have maintained a working relationship on many government projects, the companies may have a "special, integral, almost symbiotic relationship" that warrants a finding of subcontractor status. Id at 124. In other words, where such an on-going, "symbiotic" relationship exists, it would be easy for the prime contractor to secure itself from loss as a result of a default by the alleged subcontractor. Id.

Obviously, the determination of whether a particular entity is a "subcontractor" is very fact-sensitive. Applying the foregoing factors to the present case results in a finding that Havens was not a "subcontractor" for purposes of the Miller Act. Rather, Havens was a material supplier.

With respect to the nature of the goods and services provided by Havens, the relevant considerations lead the Court to conclude that Havens was not a subcontractor. As a preliminary matter, the Court notes that there is no dispute that Havens' work was necessary to the construction of the hangar. However, the structural steel provided by Havens was more akin to a company supplying pre-cut wood beams on a residential construction project than it was to a company custom-fabricating a complex, integrated system. Compare Gibson Steel, 382 F.2d at 618 (finding that entity which provided all miscellaneous steel work, including stairs, ladders, rails, and frames was a material supplier because none of the items supplied constituted a complex, integrated system) and Moon, 698 F. Supp. 665 (finding that supplier of all structural and miscellaneous steel was not a subcontractor and that the structural steel provided did not constitute a complex, integrated system), with Parker Hannifin, 477 F. Supp. 400 (finding middleman was a subcontractor where middleman custom-fabricated a complex, self-regulating, hydraulic gate system on a federal dam project) and MSI Corp., 350 F.2d 285 (finding that entity which provided custom-made hydraulic mechanism for the rapid movement of concrete roofs on a missile launcher was a subcontractor, at least in part, because the mechanism was more complex than ordinary building materials). Indeed, although Havens cut each piece of steel from non-inventory rolled steel, CPE was responsible for the design and erection of the steel frame. See Gibson Steel, 382 F.2d at 618. ("Custom manufacturing is simply not enough in itself to establish the relationship of responsibility and importance necessary to render a middle party a subcontractor."). Moreover, Havens did not perform any on-site labor. See id. (giving weight to fact that middleman did no onsite work in concluding that middleman was not a subcontractor); Wright, 194 F. Supp. at 447 (same); Moon, 698 F. Supp. at 667 (weighing fact that middleman

12

only performed minimal amount of onsite work against subcontractor status). In other words, it appears that Havens did no more than any competent steel fabricator would do on this job. On these facts, the Court finds that the nature of the goods and services provided by Havens weighs against a finding of subcontractor status.

In addition, the payment terms and exchange of information between CPE and Havens demonstrate that Havens was a material supplier. First, the work performed by Havens constituted a small portion of the total contract as it only made up 7.8% of the overall contract price. See Gibson Steel, 382 F.2d at 618 (weighing the fact that middleman's contract only constituted 2% of prime contract against subcontractor status); Moon, 698 F. Supp. at 667-68 (noting that middleman's contract only constituted 5.15% of prime contract, and thus, that percentage weighed against subcontractor status). But see Miller, 383 F.2d at 674 (finding that middleman's contract constituted more than 15% of prime contract, and therefore, weighed in favor of subcontractor status). Second, Havens was not required to post any bond nor did Havens provide any insurance or payroll data to CPE. See Gibson Steel, 382 F.2d at 618 (weighing lack of performance bond against subcontractor status); Moon, 698 F. Supp. at 667 (same); Wright, 194 F. Supp. at 448 (weighing lack of performance bond and payroll information against subcontractor status).

Finally, with respect to the overall relationship between Havens and CPE, the evidence revealed that there was no prior or subsequent relationship between the two entities outside this particular project. Therefore, it cannot be said that Havens and CPE have the kind of ongoing "symbiotic relationship" that might weigh in favor of finding that Havens was a subcontractor. Cf. F.D. Rich Co., 417 U.S. at 124 (noting that the "special, integral, almost symbiotic relationship" between prime contractor and middleman weighed in favor of finding the middleman to be a subcontractor).

      Based on the foregoing analysis, the Court concludes that Havens was a material supplier and not a subcontractor under the Miller Act. Accordingly, the Court finds for the defendants and against the plaintiff. A verdict of no cause for action shall be entered.


Dated:   September 1, 2006                    s/ Robert B. Kugler
                                                                ROBERT B. KUGLER
                                                                United States District Judge